IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROSLYN GRIFFITH and JERRET CAIN, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> CONSUMER PORTFOLIO SERVICES, INC., ) <br> ) <br> Defendant. ) <br> ) <br> ) <br> ) | Case No.: 1:10-cv-02697 <br><br> JUDGE: JOHN F. GRADY |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

The sole claim in this lawsuit is that defendant Consumer Portfolio Services, Inc. ("CPS") violated the federal Telephone Consumer Protection Act ("TCPA") by calling plaintiffs' cell phones using an "automatic telephone dialing system." CPS is entitled to summary judgment, however, because it does not use an "automatic telephone dialing system" as a matter of law.

The TCPA defines "automatic telephone dialing system" as "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). This definition is self-explanatory, and was intended to apply only to dialers used by telemarketers to call blocks of numbers randomly or sequentially. In 2003, however, the Federal Communications Commission ("FCC") expanded this definition to include certain "predictive dialers" that could store and dial lists of telephone numbers and dial those lists of numbers randomly or sequentially.

CPS uses a "Castel dialer" to call certain customers who have fallen behind on payments. This dialer, however, is not an "automatic telephone dialing system" under the plain language of the TCPA or the FCC's ruling. The Castel dialer does not fall within the plain language of the

statutory definition of an "automatic telephone dialing system" because it cannot generate, store, produce, or dial telephone numbers randomly or sequentially. The Castel dialer also falls outside the FCC's definition of an "automatic telephone dialing system" because, among other things, it lacks the capacity to store or produce telephone numbers and cannot randomly or sequentially dial telephone numbers stored on it.

Concluding that the Castel dialer is an "automatic telephone dialing system" would extend the TCPA beyond its plain language and the ruling by the FCC, and include within the TCPA dialers that Congress and the FCC never intended to regulate. For these reasons, the Castel dialer is not an "automatic telephone dialing system" under the TCPA and, therefore, summary judgment is appropriate.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.     CPS COMPUTER SYSTEM**

CPS is in the auto-finance business, lending money to consumers who have sub-prime credit scores and who are not eligible for financing for car purchases from other sources, such as banks. Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ("SUMF") ¶ 4. CPS maintains a computer network for its operations and the servers for the network are at CPS's headquarters in Irvine, California. SUMF ¶ 6. Information regarding customers – their account numbers, contact information, loan terms, and payment history, among other things – is located in a part of the CPS servers known as the Collections System, in a file known as the Customer Information File. *Id*. The customer account information in the Customer Information File is stored chronologically, by date of loan. *Id*.

**B.     THE CASTEL DIALER**

Given the number of CPS customers, it is not economical or efficient for CPS collectors to manually dial every customer who falls behind on payments. SUMF ¶ 7. Instead, each CPS office has a piece of computer hardware that dials telephone numbers, a "dialer," purchased in December 2003 from Castel, Inc. ("Castel dialer"). *Id*. Each Castel dialer is connected to the

CPS network by an Ethernet computer cable and is also connected to other computer hardware – a "private branch exchange" – that sends the calls it has made to the customers. *Id.*

**C.     STEPS LEADING UP TO A DIALING CAMPAIGN**

The Castel dialer is used during "dialing campaigns," which are a series of calls made within a relatively short period of time to a certain set of CPS customers who are behind on their payments. SUMF ¶ 8. Preparing for a dialing campaign begins the night before a dialing campaign begins; the CPS Collections System runs a program that reviews the account information for every CPS customer in the Customer Information File. SUMF ¶ 9. The purpose is to identify every customer eligible for a telephone call using the CPS dialer. *Id*. For customers whose account information meets the criteria for dialing campaigns, the program copies the account numbers and certain customer telephone numbers from the Customer Account File and places that data into a temporary "Dialer File" on the CPS system. SUMF ¶ 10. Similar to the Customer Information File, data in the Dialer File is stored in chronological order by date of loan. SUMF ¶ 10.

The next day, a supervisor in the CPS collections department decides whether to launch a dialing campaign and, if so, the specific criteria used to determine who will be called. SUMF ¶ 11. The supervisor might choose, for example, Illinois customers who owe $500 or more and are 21 to 30 days behind. Declaration of Rita Clewell ("Clewell") ¶ 7; Declaration of John Gallagher ("Gallagher") ¶ 9. The supervisor puts this information into the CPS system, and also tells the CPS system which telephone numbers to call.[1] SUMF ¶ 11. Software on the CPS system also can control the rate the dialer makes calls to help ensure that a CPS employee is always available to take the call, which is known as "predictive dialing." SUMF ¶ 12. The supervisor provides the system with parameters for predictive dialing, such as how fast the calls

---

[1] It is CPS's position that cell phone numbers cannot be called by the dialer because those telephone numbers are placed in special "fields" in the Customer Information File that are not accessible by the Castel dialer. Plaintiffs dispute this claim but this issue need not be resolved for purposes of this motion.

3

should be made, how many calls to make at once, and how long the calls should be expected to last. *Id*.

Once the criteria is input into the CPS Collections System, the software the supervisor used to create the dialing campaign reviews the Dialer File, looking for customers whose account status satisfies the campaign criteria. SUMF ¶ 13. Using the example above, the application would seek Illinois customers who owe $500 or more and are 21 to 30 days behind on a payment. Gallagher ¶ 11. For the customers meeting the criteria for the dialing campaign, the software creates what is known as a "logical view" file, which is a file that is limited to account numbers and telephone numbers that will be used for the dialing campaign. SUMF ¶ 13.

At the same time, the supervisor assigns certain CPS collectors to the campaign so they can answer calls. SUMF ¶ 14. Those collectors then "sign on" to the campaign through the CPS Collections Software, which enables calls made by the dialer and connected to a customer to be routed to their phones. *Id*.

### D. THE DIALING PROCESS FOR THE CASTEL DIALER

The cable connection between the Castel dialer and the CPS system serves as a kind of open connection, a "pipe," between the dialer and the system. SUMF ¶ 15. Once the supervisor instructs the Collections System to begin the dialing campaign, the Castel dialer reads the telephone numbers in the logical view file and dials them at the predictive dialing rate set by the supervisor. *Id*. If a person picks up the phone, the Castel dialer routes the call back to the CPS system, which forwards the call to an available CPS collector, and the CPS Collection System pops the customer's account information on the collector's desktop computer screen. SUMF ¶ 16. As the collector speaks with the customer and updates the customer's account information, the information is entered directly into the CPS Customer Information File on the CPS network. SUMF ¶ 17. When the campaign has ended, the CPS system prepares reports on the results of the dialing campaign. *Id*.

An accurate graphic depicting the dialing process is attached to the accompanying Declaration of Brian Cutler as Exhibit B.

4

### E.     THE CASTEL DIALER DIFFERS FROM OTHER DIALERS

####    1.     A Brief History Of Dialers

Dialers were first used in the telemarketing industry. SUMF ¶ 19. These dialers generated telephone numbers randomly or sequentially and then dialed those telephone numbers automatically. *Id.* Thus, the dialer could call every telephone number in Chicago by randomly dialing every possible telephone number, or it could start at the lowest possible number, 111-1111, and work its way up, one number at a time, until every possible phone number had been called. *Id.* Since the dialers called every conceivable telephone number, including ones not in use or that connected to hospital rooms, government offices, and other emergency lines, the dialers, while more efficient than manual dialing, were not the most effective tools for connecting telemarketers with potential consumers. *Id.*

Over time, dialers were developed by different vendors that could call lists of people. SUMF ¶ 20. This type of dialer was more efficient and effective for telemarketers than dialing numbers randomly or sequentially. *Id.* It was also useful to companies in other industries that relied on telephones to communicate with customers, such as banking, finance, and collection companies. *Id.* Before dialing any numbers, the dialer would download data on customers – names, telephone numbers, addresses, account numbers, among other things – from the computer system maintained by the company, the "host system." SUMF ¶ 21. After dialing numbers, the dialer would connect the call to company employees, and would maintain data on the results of the call – whether it connected to a person, was picked up by an answering machine, or did not answer – so it could later produce reports on the success of the campaign. SUMF ¶ 22. Company employees were connected to the dialer, and had access to data on the dialer, which could be updated during calls. SUMF ¶ 23. At night, after the dialing campaigns, the updated information on the dialer would have to be loaded back on to the host system. SUMF ¶ 24. The

host system would then replace the old data with the new data provided by the dialers so the company's employees had up to date information when they arrived at work the next day.[2] *Id.*

Software that was developed to assist in the dialing process – predictive dialing software, software that predicted how long it would should take for customers to pick up the phone, and that could detect whether the call was answered by voicemail – were also loaded on to the dialer. SUMF ¶ 25.

### 2. The Castel Dialer Lacks the Capacities of Other Dialers

The Castel dialer differs significantly from random or sequential dialers used by telemarketers or other dialers on the market. SUMF ¶ 26. The Castel dialer is unlike a random or sequential dialer because it lacks the capacity to store or produce telephone numbers using a random or sequential number generator. *Id*. It also cannot dial numbers randomly or sequentially. *Id*.

The Castel dialer is also materially different from the other dialers for a number of reasons. Particularly, the Castel dialer lacks the capacity to perform the following functions:

    a)     it cannot download lists of names, contact information, and other account data from a computer server;

    b)     it cannot store, or produce lists of names, contact information, and other account data;

    c)     it cannot store predictive dialing or other software that predicts how long the call should ring before being hung up and that can detect answers by voicemail, instead, that software is on the CPS Collections System;

    d)     it cannot dial telephone numbers automatically, but reads the telephone numbers; and,

    e)     it cannot generate records of telephone calls or produce reports of dialing campaigns.

SUMF ¶ 27.

---

[2] This is a relatively cumbersome process, however, and results in there being a period of time when the computer system and the dialer are out of sync because the dialer has updated information while the host system does not. Gallagher fn. 2; Cutler fn. 1.

### III. ARGUMENT

**A.     INTRODUCTION**

This case rests on whether CPS used an "automatic telephone dialing system" under the TCPA. As explained below, to be an "automatic telephone dialing system," the TCPA requires that a dialer be able to store or produce and dial telephone numbers using a random or sequential number generator. The FCC, under its rule-making authority, has held that a dialer will be considered an "automatic telephone dialing system" if it can also store or produce telephone numbers and if it can dial those numbers randomly or sequentially. The Castel dialer, however, does not meet either definition. It cannot store, produce, or dial telephone numbers using a random or sequential number generator. It also cannot store or produce lists of telephone numbers or dial those numbers randomly or sequentially. Additionally, finding that the Castel dialer falls outside the TCPA is consistent with Congressional intent, because the TCPA was intended to regulate telemarketing calls, not debt collection calls. Consequently, summary judgment is appropriate.

**B.     THE CASTEL DIALER IS NOT AN AUTOMATIC TELEPHONE DIALING SYSTEM UNDER THE TCPA.**

     **1.     The TCPA Requires that Equipment Store or Produce Telephone Numbers and Dial Those Numbers Randomly or Sequentially to Fall Within the Statute.**

The TCPA prohibits calls to certain telephones, including cell phones, using an "automatic telephone dialing system," which the statute defines as "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1), (b)(1)(iii). Federal courts interpreting "automatic telephone dialing system" have confirmed that, to fall within the statute, the equipment must have the capacity to store or produce, and dial, telephone numbers using a random or sequential number generator. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) ("the focus must be on whether the equipment has the *capacity* "to store or produce telephone numbers to be called, using a random or sequential number generator."); *Abbas v. Selling Source, LLC*, Case No. 09 CV 3413, 2009 U.S. Dist. LEXIS 116697, at *13

7

(N.D. Ill. Dec. 14, 2009) ("The plain text of the statute requires only 'the capacity' for such random or sequential generation")(citing *Satterfield*, 569 F.3d at 950).

The FCC, which regulates the TCPA, 47 U.S.C. § 227(b)(2), initially agreed with this common sense interpretation of "automatic telephone dialing system," stating at one point:

> The prohibitions of § 227(b)(1) clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services … *because the numbers called are not generated in a random or sequential fashion*.

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 7 FCC Rcd 8752, ¶ 47 (1992) (1992 FCC Order) (emphasis supplied). In 2002, however, the FCC issued a Notice of Proposed Rule Making seeking comments on whether a "predictive dialer" should be considered as an automatic telephone dialing system. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Notice of Proposed Rulemaking and Memorandum Opinion and Order*, CG Docket No. 02-278, 177 FCC Rcd 17459 fn. 37 (2002) ("NPRM"). In comments submitted in response to the NPRM, it was argued that a predictive dialer was not an automatic telephone dialing system because it did not *dial* numbers randomly or sequentially. One comment argued, for example:

> The main rationale for the Commission's autodialer rule, which is to prevent autodialers from randomly calling an emergency line, hospital room, or a telephone for which the called party is charged for the call, does not appear to be relevant in the context of predictive dialers. Predictive dialers are used to dial numbers the telemarketer *intends* to call, not randomly generated numbers which might include hospital rooms.

Comments of Household Financial Services, Inc., dated December 6, 2002, a copy of which are attached to the Stone Dec. as Ex. A, at 7; *see also* Comments of Mastercard International dated Dec. 9, 2002, Ex. B, Stone Dec., at 6; Comments of the American Teleservices Association dated Dec. 9, 2002, Ex. C, Stone Dec., at 113 ("Predictive dialers do not generate 'random' or 'sequential' telephone numbers. Instead, they rely on telephone numbers from lists provided by the equipment operator. These lists are anything but 'random' or 'sequential.'"); Comments of the Direct Marketing Association dated Dec. 9, 2002, Ex. D, Stone Dec., at 21 (Whether a

8

predictive dialer is an "automatic telephone dialing system" "turns on whether the device is 'capable' of generating numbers for random or sequential dialing."). It was not argued, in other words, that a predictive dialer fell outside the TCPA because it did not have the *capacity* to store or produce telephone numbers or that it lacked the capacity to dial numbers randomly or sequentially.

In 2003, the FCC found that certain predictive dialers were automatic telephone dialing systems under the TCPA merely because they could store or produce telephone numbers and dial those numbers randomly or sequentially. The FCC reasoned that, aside from the fact that these predictive dialers stored and dialed lists of numbers, they were no different from random or sequential dialers:

> The [predictive dialer] hardware, when paired with certain software, *has the capacity to store or produce numbers and dial those numbers at random, in sequential order*, or from a database of numbers. … The principal feature of predictive dialing software is a timing function, not number storage or generation. Household Financial Services states that these machines are not conceptually different from dialing machines without the predictive computer program attached.

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 188 FCC Rcd 14014, ¶ 131 (2003) ("2003 FCC Order") (emphasis supplied).[3]

The FCC has recently confirmed its position that a dialer must store or produce telephone numbers and be able to dial those numbers randomly or sequentially to be considered an automatic telephone dialing system under the TCPA. Indeed, on the FCC's website is a publication addressing the TCPA that defines automatic telephone dialing systems as "Autodialers [that] can produce, store, and dial telephone numbers *using a random or sequential number generator*." Unwanted Telephone Marketing Calls, available at http://www.fcc.gov/cgb/consumerfacts/tcpa.html ("FCC Unwanted Marketing Calls

---

[3] In 2008, the FCC affirmed its decision, denying a petition for reconsideration because it did not raise any new facts and because it concluded that a predictive dialer still had the capacity to store or produce and to dial a number randomly or sequentially. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Request of ACA Int'l for Clarification and Declaratory Ruling*, 23 FCC Rcd 559, 563 (2008) (2008 Order).

Publication") (emphasis supplied). Thus, even under the FCC's expanded definition, predictive dialers are not automatic telephone dialing systems regulated by the TCPA unless they can store or produce telephone numbers and can dial those numbers randomly or sequentially.

   **2.**  **The Castel Dialer Cannot Store or Produce Telephone Numbers or Dial Numbers Randomly or Sequentially**

  The Castel dialer used by CPS is not an "automatic telephone dialing system" under the TCPA. Under the plain language of the TCPA as well as court decisions interpreting it, the equipment must have the capacity to store or produce, and dial, numbers randomly or sequentially. 47 U.S.C. § 227(a)(1); *Satterfield*, 569 F.3d at 951. The Castel dialer does not satisfy this definition since it cannot store or produce numbers using a random or sequential number generator and cannot dial numbers randomly or sequentially. SUMF ¶ 26.

  The FCC has defined "automatic telephone dialing system" to require that the equipment store or produce telephone numbers and be able to dial those numbers randomly or sequentially. 2003 Final Order ¶ 132.[4] The requirement that the dialer be able to store or produce lists of numbers and be able to dial those numbers randomly or sequentially was the crucial linchpin to the FCC's ruling. 2003 FCC Order ¶ 131 (The [predictive dialer] hardware, when paired with certain software, *has the capacity to store or produce numbers and dial those numbers at random, in sequential order*, or from a database of numbers) (emphasis supplied). As the FCC has acknowledged, the TCPA requires that the dialer have at least this capacity to be an automatic telephone dialing system under the TCPA. *See* 2003 FCC Order ¶ 133 (stating that the TCPA requires "that equipment have the 'capacity to store or produce telephone numbers to be called'"); *see also* 1992 FCC Order ("The prohibitions of § 227(b)(1) clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services … because the numbers called are not generated in a random or sequential fashion."); *id.* ¶ 39 (debt collection calls "are not autodialer calls (i.e., dialed using a random or sequential number

---

[4] The FCC's final orders are binding on this Court. Under the Hobbs Act, a final order of the FCC can only be set aside or invalidated by a federal court of appeal. 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a). A federal district court is bound to follow an FCC final order under the TCPA. *CE Design Ltd v. Prism Bus. Media, Inc.*, 606 F.3d 443, 446 (7th Cir. 2010).

generator)"); FCC Unwanted Marketing Calls Publication, at 3 ("Autodialers can produce, store, and dial telephone numbers using a random or sequential number generator."). The Castel dialer is not an automatic telephone dialing system under this definition because it lacks the capacity to store or produce telephone numbers. Instead, the Castel dialer merely reads telephone numbers stored on the CPS Collections System before dialing the numbers. In addition, since the Castel dialer is not storing telephone numbers, it lacks the capacity to dial those telephone numbers randomly or sequentially. Rather, the numbers are chosen by the CPS Collections System using criteria provided by CPS for the dialing campaign. In addition, unlike the predictive dialer being considered by the FCC, the Castel dialer cannot store predictive dialing software, or other software used to predict when a call will be answered or whether the call has been answered by voicemail. Rather, that software is also on the CPS Collections System. For these reasons, the Castel dialer does not meet the FCC's definition of automatic telephone dialing system.

To hold otherwise, and conclude that the Castel dialer is an automatic telephone dialing system, would expand the TCPA beyond the plain language of the statute and be contrary to the fundamental rules of statutory interpretation. "When the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Shlahtichman v. 1-800 Contacts, Inc.*, 615 F.3d 794, 798 (7th Cir. 2010). In *Schlachtiman*, the Seventh Circuit rejected an argument that the Fair and Accurate Credit Transactions Act of 2003 ("FACTA") should apply not only to "printed" receipts, but extend to emailed ones as well even though the statute only referred to "printed" receipts. The court held:

> We recognize that section 1681c(g) was one of several provisions in FACTA that were enacted to combat identity theft. … But we may not ignore the unambiguous language of the statute in order to further Congress's expressed purpose in enacting the statute. *Morrison v. Nat'l Australia Bank Ltd.*, -- U.S. --, 130 S. Ct. 2869, 2886, 177 L.Ed. 535 (2010) ("It is our function to give the statute the effect its language suggests, however modest that may be; not to extend it to admirable purposes it might be used to achieve."). … to apply the statute to receipts that are emailed to the consumer would broaden the statute's reach beyond the words that Congress actually used.

615 F.3d at 802. Finding that the Castel dialer is not an automatic telephone dialing system comports with these fundamental rules of statutory interpretation since the dialer does not satisfy the definition under the plain language of the statute or the FCC's ruling.

Finally, looking at the definition of automatic telephone dialing system in context confirms that the statute should not apply to the Castel dialer. *Shlahtichman*, 615 F.3d at 798, 800 ("we must also look to the statute as a whole in discerning a term's meaning rather than examining it in isolation … Ultimately, statutory language only has meaning in context") (internal citations and alterations omitted). The TCPA was enacted "in an effort to address a growing number of telephone marketing calls and certain telemarketing practices Congress found to be an invasion of consumer privacy." *Starkey v. Firstsource Advantage, LLC*, No. 07-CV-662A(Sr), 2010 WL 2541756, at *3 (W.D.N.Y. Mar. 11, 2010). *Meadows v. Franklin Collection Serv., Inc.*, No. 7:09-CV-00605-LSC, 2010 U.S. Dist. LEXIS 72340, at *16 (N.D. Ala. June 25, 2010) (the TCPA was "enacted in an effort to address telephone marketing calls and practices"). The other provisions of the TCPA are limited to telemarketing practices – advertisements sent by pre-recorded voice and fax. 47 U.S.C. § 227(b)(1)(B), (C). As the FCC has recognized, however, debt collection calls are not telemarketing calls and were not intended to fall within the TCPA. *See* 2008 FCC Order ("calls solely for the purpose of debt collection are not telephone solicitations and do not constitute telemarketing"); 1992 FCC Order (debt collection calls "are not autodialer calls (i.e., dialed using a random or sequential number generator)"); *Meadows*, 2010 U.S. Dist. LEXIS 72340, at *16 (dismissing claims under the TCPA for autodialed calls to a cell phone because "the FCC has determined that *all debt collection circumstances* are excluded from the TCPA's coverage"). Thus, finding that the Castel dialer does not fall within the TCPA is required by both the letter and spirit of the TCPA and the FCC's interpretations of the statute.

## IV. CONCLUSION

The Castel dialer used by CPS is not an "automatic telephone dialing system" under the TCPA as a matter of law. It cannot satisfy the statute's definition of an "automatic telephone

12

dialing system" because the Castel dialer cannot store, produce or dial numbers using a random or sequential number generator. It cannot satisfy the FCC's interpretation of the term because the Castel dialer cannot store or produce lists of telephone numbers or randomly or sequentially dial those numbers. In addition, Congress implemented the TCPA to regulate telemarketing calls, and the Castel dialer is used for collection purposes. Because the only claim here is that CPS violated the TCPA by using an "automatic telephone dialing system," summary judgment is appropriate.

Respectfully submitted,

DEFENDANT CONSUMER PORTFOLIO SERVICES, INC.

By: */s/ Gregory D. Hopp*
Gregory D. Hopp
COZEN O'CONNOR
333 West Wacker Drive
Suite 1900
Chicago, Illinois  60606
Telephone: 312.382.3100
Toll Free Phone: 877.992.6036
Facsimile: 312.382.8910

AND

By: */s/ Benjamin J. Stone*
Benjamin J. Stone, *Pro Hac Vice*
Molly Siebert Eckman, *Pro Hac Vice*
COZEN O'CONNOR
1201 Third Avenue
Suite 5200
Seattle, Washington  98101
Telephone: 206.340.1000
Toll Free Phone: 800.423.1950
Facsimile: 206.621.8783