**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**


ROSLYN GRIFFITH and JERRET CAIN,      )
                                      )
          Plaintiffs,                 )
                                      )
          v.                          )      No. 10 C 2697
                                      )
CONSUMER PORTFOLIO SERV., INC.,       )
                                      )
          Defendant.                  )


**MEMORANDUM OPINION**

Before the court is defendant Consumer Portfolio Services, Inc.'s ("CPS") motion for summary judgment. For the reasons explained below, we deny CPS's motion.

**BACKGROUND**

The named plaintiffs in this case, Roslyn Griffith and Jerret Cain, allege that they received unauthorized telephone calls and text messages on their cellular telephones from CPS, a sub-prime auto-finance lender. The sole question raised by CPS's motion for summary judgment is whether it employs an "automatic telephone dialing system," as that term is defined by the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(a). The manner by which CPS places its debt-collection calls is largely undisputed. CPS stores customer information on its computer network chronologically (by loan date) in a file known as the "Customer Information File." (Def.'s Stmt. of Undisputed Material Facts in Support of its Mot.

for Summ. J. (hereinafter, Def.'s Stmt.) ¶¶ 5-6.)  The Customer
Information File is located in a portion of CPS's computer network
known as the "Collections System."  (Id. at ¶ 6.)  In each of its
offices CPS maintains a "dialer," manufactured by Castel, Inc.,
which automatically places calls to CPS customers "so that [CPS]
does not have to manually dial every customer who falls behind on
payments."  (Id. at ¶ 7.)  Each Castel dialer connects to: (1)
CPS's computer network; and (2) a "private branch exchange," which
connects the dialer to the customers it calls.  (Id.)  Using this
equipment CPS conducts "dialing campaigns," calling multiple
customers at a given time.  (Id. at ¶ 8.)

     The night before a dialing campaign begins, a computer program
reviews account information for every CPS customer listed in the
Customer Information File and identifies customers eligible for the
dialing campaign using criteria selected by CPS.  (Id. at ¶ 9; see
also Gallagher Decl. ¶ 8 (stating that as a first cut CPS might,
for example, use the program to identify all customers who are less
than 60 days in arrears).)  This same program then copies the
account and telephone numbers of each eligible customer into a new
temporary computer file called the "Dialer File."  (Def.'s Stmt. ¶
10.)  On the day of the campaign, a supervisor in CPS's collections
department inputs additional criteria for the dialing campaign into
CPS's Collections System, "effectively telling the CPS Collection
System which numbers the dialer should call."  (Id. at ¶ 11; see

also Clewell Decl. ¶ 7 ("The supervisor might decide, for example, that Illinois customers who owe $500 or more and are 21 to 30 days behind should be called during the campaign.").) The program then reviews the Dialer File for accounts that satisfy the criteria and copies those accounts and associated telephone numbers into a new file called the "Logical View File." (Def.'s Stmt. ¶ 13.) At the same time, the supervisor assigns certain CPS employees ("collectors") to the campaign, who then use the program to "'sign on' to the campaign so that they can 'answer' the calls made by the Castel dialer that actually connect to consumers." (Id. at ¶ 14.) Once the dialing campaign begins, the Castel dialer "reads" the telephone numbers at the "predictive dialing rate" set by the supervisor. (Id. at ¶ 15.) ("Predictive dialing" software on the Collections System regulates the dialer's call rate to improve efficiency. (Gallagher Decl. ¶ 10; see also Def.'s Stmt. ¶ 12.)) The dialer determines whether a call is answered by a customer, and if so, routes the call back to CPS's computer system, which forwards the call to an available collector. (Def.'s Stmt. ¶ 16.) The customer's account information appears on the collector's computer screen as he or she receives the call. (Id.) While speaking with the customer, the collector enters data into the Customer Information File in the Collections System. (Id. at ¶ 17.) After the dialing campaign is completed, the Collections

System prepares reports on the results of the dialing campaign. (Id.)

## DISCUSSION

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

**B.   "Automatic Telephone Dialing System"**

The TCPA prohibits calls to certain telephone numbers, including cellular telephone numbers, using an "automatic telephone dialing system," except in an emergency or with the recipient's "prior express consent."  47 U.S.C. § 227 (b)(1).  As defined in the statute, an "automatic telephone dialing system" means "equipment that has the capacity — (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227 (a)(1). The phrase "random or sequential number generator" is not defined. As we understand these terms, "random number generation" means random sequences of 10 digits, and "sequential number generation" means (for example) (111) 111-1111, (111) 111-1112, and so on. CPS's expert states that early dialers operated in this fashion, calling every conceivable telephone number.  (Cutler Decl. ¶ 15.) More recently, companies like Castel have developed dialers that call lists of known telephone numbers — in this case, the telephone numbers of CPS's customers.  (Id. at ¶ 16.)

In 2002, the FCC solicited comments concerning the TCPA's definition of an "automatic telephone dialing system."  See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 17 FCC Rcd 17459, 17473-476 (September 18, 2002).  The FCC acknowledged that autodialing technology had advanced.  See id. at 17474 ("More sophisticated dialing systems,

such as predictive dialers and other electronic hardware and software containing databases of telephone numbers, are now widely used by telemarketers to increase productivity and lower costs."). In light of that fact, it sought comments concerning "whether Congress intended the definition of 'automatic telephone dialing system' to be broad enough to include any equipment that dials numbers automatically, either by producing 10-digit telephone numbers arbitrarily or generating them from a database of existing telephone numbers." Id. "Specifically, we ask whether a predictive dialer that dials telephone numbers using a computer database of numbers falls under the TCPA's restrictions on the use of autodialers." Id. at 17475. As CPS points out, several companies argued that predictive dialers fell outside the TCPA's scope because a list or database of actual customer telephone numbers is, by definition, not randomly or sequentially generated. See, e.g., Comments of the American Teleservices Ass'n, attached as Ex. C to Stone Decl., at 113 ("Predictive dialers do not generate 'random' or 'sequential' telephone numbers. Instead, they rely on telephone numbers from lists provided by the equipment operator. These lists are anything but 'random' or 'sequential.'"). The thrust of these comments was that Congress, in enacting the TCPA, intended to regulate an especially vexatious type of autodialing, not autodialing generally. (See, e.g., Comments of Mastercard Int'l Inc., attached as Ex. B to Stone Decl., at 6 ("[P]redictive

dialers are generally used to dial numbers the telemarketer *intends* to call, not those randomly generated which may include hospital rooms, etc.") (emphasis in original).)

The FCC effectively rejected these comments, concluding that "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." <u>In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991</u>, 18 FCC Rcd 14014, 14093 (July 3, 2003). The technology had changed, but the basic function of such equipment — "the *capacity* to dial numbers without human intervention" — had not. <u>Id.</u> at 14092 (emphasis in original). The FCC went on to conclude that,

> [T]o exclude from [the restrictions on automated and prerecorded calls] equipment that use [sic] predictive dialing software from the definition of "automated telephone dialing equipment" simply because it relies on a given set of numbers would lead to an unintended result. Calls to emergency numbers, health care facilities, and wireless numbers would be permissible when the dialing equipment is paired with predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists and software packages. We believe the purpose of the requirement that equipment have the 'capacity to store or produce telephone numbers to be called' is to ensure that the prohibition on autodialed calls not be circumvented.

<u>Id.</u> at 14092-93. In 2008, in response to a request for clarification, the FCC "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." <u>In the Matter</u>

<u>of Rules and Regulations Implementing the Telephone Consumer
Protection Act of 1991</u>, 23 FCC Rcd 559, 566 (Jan. 4, 2008). The
petitioner requesting clarification argued that "a predictive
dialer meets the definition of autodialer only when it randomly or
sequentially generates telephone numbers, not when it dials numbers
from customer telephone lists." <u>Id.</u> The FCC rejected this
interpretation, citing the policy considerations that guided its
2003 ruling. <u>Id.</u> at 566-67.

CPS acknowledges that the FCC's final orders are binding on
this court under the Hobbs Act. <u>See</u> 28 U.S.C. § 2342(1); 47 U.S.C.
§ 402(a); <u>CE Design Ltd. v. Prism Bus. Media, Inc.</u>, 606 F.3d 443,
446-50 (7th Cir. 2010); (Def.'s Mem. at 10 n.4). But it argues
that the FCC's 2003 and 2008 orders are really quite narrow.
According to CPS, to fall within the FCC's interpretation of an
"automatic telephone dialing system" the equipment in question must
have the technical ability to perform the now obsolete functions
performed by dialers when Congress originally passed the TCPA.
That is, it must be able to "store or produce numbers using a
random or sequential number generator" and "dial numbers randomly
or sequentially." (Def.'s Mem. at 10.) According to CPS's
witnesses, the Castel dialer cannot perform these functions.
(Cutler Decl. ¶¶ 19-20; Gallagher Decl. ¶ 16.) CPS's
interpretation of the FCC's orders, which it supports by quoting
portions of those orders out of context, is a transparent attempt
to win through litigation a battle that other companies lost before

the FCC.[1]  After straining to avoid the clear implications of the
FCC's orders, CPS finally resorts to the argument that the FCC
cannot have meant what it said because it is inconsistent with the
TCPA.  (Def.'s Reply at 4.)  This is not the appropriate forum to
challenge the validity of the FCC's orders.  See CE Design Ltd.,
606 F.3d at 450.  Our role is to apply the FCC's orders to the
facts.  Id. at 446 n.3.  The FCC concluded that predictive dialers
are governed by the TCPA because, like earlier autodialers, they
have the capacity to dial numbers "without human intervention."[2]
In doing so, it interpreted "automatic telephone dialing system" to
include equipment that utilizes lists or databases of known,
nonrandom telephone numbers.  That is precisely how CPS's equipment
operates: the dialer automatically dials numbers stored in the
Logical View File and routes answered calls to available
collectors.  Even assuming that CPS's equipment can only function
in this way, and cannot generate and dial random or sequential

---

[1] Even if we accepted CPS's interpretation, we would not award it summary
judgment based upon the conclusory testimony of its witnesses.  See, e.g., Bourne
v. Marty Gilman, Inc., 452 F.3d 632, 638 (7th Cir. 2006) ("[A]n expert's
conclusory assertions are of no evidentiary value.").  The dialer dials the
numbers it is "told" to dial.  (Pl.'s Stmt. ¶ 11.)  Gallagher and Cutler do not
explain why they believe that the Castel dialer cannot be "told" — i.e.,
programed — to dial numbers randomly or sequentially.  They simply conclude
without any explanation or analysis that it cannot perform these functions.

[2] Gallagher's insistence that the Castel dialer "cannot dial numbers
automatically" is disingenuous.  (Gallagher Decl. ¶ 16.)  CPS's collectors do not
dial the numbers, the dialer does.  (Def.'s Stmt. ¶ 7 ("CPS maintains a Castel
Dialer in each of its offices so that it does not have to manually dial every
customer who falls behind on payments.").)  This is "automated dialing" under any
reasonable interpretation of that phrase.  The fact that it is more efficient
than manual dialing is one of the reasons that it is regulated.  See In the
Matter of Rules and Regulations Implementing the Telephone Consumer Protection
Act of 1991, 18 FCC Rcd at 14092 (calls from autodialers to restricted categories
of telephone numbers are "particularly troublesome" because "autodialers can dial
thousands of numbers in a short period of time.").

numbers (<u>cf.</u> <u>supra</u> n. 1), it is still an "automatic telephone
dialing system."[3]  Likewise, we find no support in the statute or
the FCC's rulings for CPS's argument that the dialer itself must
"store" telephone numbers and/or predictive dialing software.
(Def.'s Mem. at 11.)  The statute regulates "equipment," not
"dialers," so it is irrelevant for our purposes that the Castel
dialer works in tandem with CPS's Collections System.  (<u>Cf.</u> <u>id.</u>)
Indeed, the FCC plainly intended to prevent companies from
circumventing the statute in this fashion.  <u>In the Matter of Rules</u>
<u>and Regulations Implementing the Telephone Consumer Protection Act</u>
<u>of 1991</u>, 18 FCC Rcd at 14092-93.  Plaintiffs ask us both to deny
CPS's motion and to hold for plaintiffs as a matter of law on the
same issue.  (Pls.' Mem. at 2.)  We will grant the request.  For
the reasons we have just explained, we conclude as a matter of law
that CPS employs an "automatic telephone dialing system" to call
its customers.

Finally, we reject CPS's argument that the TCPA only applies
to telemarketing, not debt collection.  (Def.'s Mem. at 12; Def.'s
Reply at 8-10.)  Certain TCPA provisions apply only to "telephone
solicitations," and consequently those provisions do not apply to
debt-collection calls.  <u>In the Matter of Rules and Regulations</u>
<u>Implementing the Telephone Consumer Protection Act of 1991</u>, 23 FCC

---

[3]  Insofar as <u>Satterfield v. Simon & Schuster, Inc.</u>, 569 F.3d 946, 950-51
(9th Cir. 2009) can be read to support a different result, we reject it.  The
<u>Satterfield</u> court did not analyze or even cite the relevant provisions of the
FCC's 2003 and 2008 orders.

Rcd at 565. But § 227(b)(1)(A)(iii) — the provision that plaintiffs allege CPS violated — "prohibits the use of autodialers to make any call to a wireless number in the absence of an emergency or the prior express consent of the called party. . . . [T]his prohibition applies regardless of the content of the call, and is not limited only to calls that constitute 'telephone solicitations.'" Id.

## CONCLUSION

CPS's motion for summary judgment (24) is denied. CPS's motion to strike the declaration of Randall Snyder (61) is denied as moot. We hold, as a matter of law, that CPS employs an "automatic telephone dialing system" to call its customers.

DATE:     August 16, 2011

ENTER:    _____

John F. Grady, United States District Judge